IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 35547-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| NORMAN JAMES BESSETT, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Norman Bessett appeals his conviction for first degree burglary. Because sufficient evidence supports the trial court's guilty adjudication, we affirm.

FACTS

This prosecution arises from Norman Bessett's entry of his former girlfriend's home and physical restraints imposed on her on February 8, 2017. We take the facts from trial testimony.

In March 2016, Norman Bessett and Cindy McClure reconnected after forty years and began a romantic relationship. In April, Bessett, with all possessions, moved into McClure's Ephrata residence. Bessett occupied McClure's garage with chattels and filled the home with furniture. Two large tarps outside the garage blanketed more of Bessett's belongings. In April, Bessett proposed marriage, and McClure accepted.

On December 1, 2016, Cindy McClure notified Norman Bessett that she wished the relationship ended and directed him to move from her residence. A heartbroken Bessett sought to continue the relationship. He resided in the abode until January 1, 2017. In January, Bessett, with some necessities, vacated the home, but left furniture inside the residence and other possessions in the garage and under the tarps. According to McClure, she allowed Bessett access to the garage to periodically retrieve his belongings, but told him not to enter the house. A retained garage door opener permitted him entry into the garage. According to Bessett, McClure never told him that she did not desire him inside the dwelling.

After Norman Bessett departed in January, Cindy McClure changed the locks to her house and did not give Bessett a new key. Between January 1 and February 8, 2017, McClure saw Bessett removing property from her garage, and they occasionally discussed the removal. McClure spoke with Bessett only in her garage and did not invite him inside the dwelling. After the conversations, McClure entered the home through a door between the attached garage and the home. After entry, she locked the door.

The trial testimony of Cindy McClure and Norman Bessett diverged as to events on February 8, 2017. We first present the testimony of McClure.

On February 8, Cindy McClure left home for work at 6:20 a.m. She expected the housekeeper to arrive later that morning, so McClure left the front door to the house unlocked. Norman Bessett informed McClure days earlier that the starter in his truck no

longer worked, and, therefore, McClure believed the truck to be inoperable. She would have locked the front door if she knew Bessett would have transportation to her domicile. McClure testified that she thought that Bessett lacked a key to the house, but she forgot that she handed him a key early in the relationship to watch her cats one weekend. We cannot discern from the testimony whether McClure handed him this key after she changed the locks.

On February 8, Cindy McClure returned home for lunch at noon, parked in the garage, and locked the door between the garage and the house. The housekeeper had already finished the housework and had left. McClure returned to work after lunch, but left work earlier than usual. McClure parked in the garage, unlocked the door into the residence, and went to her bedroom to change attire. To her surprise, Norman Bessett stepped from the closet and grabbed McClure.

A frightened Cindy McClure exclaimed, "'what in the hell are you doing in here and how did you get in?'" Report of Proceedings (RP) at 125. Norman Bessett responded: "'I just want to hold you and get a hug and a kiss.'" RP at 126. Bessett wrapped McClure from behind, placed his arms over her arms, and locked his hands so she could not move. When McClure attempted to wriggle free, Bessett tightened his grasp. He told her that he wanted to mend the relationship. McClure promptly replied: "[w]e're done." RP at 127. As McClure stood confined in Bessett's arms, she noticed her bedroom clock read 4:02 p.m. The clock read 6:28 p.m., when McClure gained her

freedom.  Bessett clutched McClure without her consent during the intervening two hours and twenty-six minutes.

While hostage to Norman Bessett, Cindy McClure talked to Bessett to calm him. Bessett insisted on discussing counseling.  McClure occasionally sought to free herself, but she could not overcome the larger force of Bessett.  McClure never told Bessett to "stop."  RP at 158.  She wanted to live.  McClure lied to Bessett when telling him her nurse would soon arrive and would call law enforcement.

During the interminable restraint, Norman Bessett told Cindy McClure he entered her unlocked house, through the front door, around 8:30 a.m. that morning and entered the garage to retrieve paperwork.  Bessett then flipped McClure around to face him and threw her, face up, onto the bed.  He took McClure's hands and pushed them against her right cheek, forcing her face into the bed.  The pressure caused pain and terrified McClure.  McClure asked: "'are you going to kill me?'" and "'why are you trying to . . . break my neck?'"  RP at 156-57, 289.

After more time passed, Norman Bessett declared "it wasn't worth it," and he stepped from the bed.  RP at 137.  Cindy McClure rose from the bed, walked to the kitchen, and retrieved her cell phone.  Bessett uttered some words that McClure did not understand, and he walked into the garage.  McClure followed and asked him to repeat his remark.  Bessett answered that nothing mattered anymore.

4

Cindy McClure returned inside the residence, grabbed her purse and keys, and sprinted across the street to her neighbor's house. As McClure exited, Norman Bessett slashed his throat and wrists. McClure told the neighbor that Norman Bessett was in her garage and committing suicide. The neighbor called law enforcement. On arrival at McClure's residence, Ephrata Police Officer Damon Powell found Bessett in McClure's bathroom leaning against a tub that encased bloody water. Officers seized a utility and a bread knife from the bathroom. After emergency treatment, Bessett recovered.

We now relate Norman Bessett's testimony at trial. Bessett had applied for a job that needed a resume. On February 8, Bessett journeyed to Cindy McClure's residence to retrieve the document. Bessett drove to Ephrata, parked his truck behind Tiger Paws gas station, and walked a mile as part of his new exercise regime.

Norman Bessett arrived at Cindy McClure's property at 8:30 a.m., tried to open the garage, but his garage door opener malfunctioned. Bessett ambled to the front door, removed his key, but found the front door unlocked. The unlocked door prompted Bessett to conclude that the housekeeper would soon arrive. Bessett entered the house and quickly found his resume. He had not initially planned to spend the day at McClure's residence, but, once inside, he decided to pack more of his belongings in the garage.

Norman Bessett did not alert the housekeeper to his visit, and he either remained in the garage or vacated the premises during her presence so the housekeeper could not

5

allege impropriety.  Bessett did not know that Cindy McClure returned home for lunch because he toiled in the garage and she parked outside the garage.

According to Norman Bessett, he re-entered the dwelling portion of Cindy McClure's property in the afternoon to retrieve clothing stored in closets.  McClure returned home unexpectedly.  Bessett exited a closet and greeted McClure.  Bessett's presence pleasantly surprised McClure.  He hugged her with permission, but she refused a kiss.  The two sat on the bed and talked.  When they both later stood, Bessett hugged a receptive McClure from behind.  McClure entangled her legs with Bessett's legs and the two tumbled to the bed with him on top.  Bessett immediately removed himself from McClure, and the two spoke for another ten to fifteen minutes.

Cindy McClure went to the kitchen, and he followed.  Norman Bessett grew devastated when McClure grabbed her cell phone and told him she would call his mother and the police to report an assault.  Bessett entered the garage, retrieved his utility knife, and started to cut his wrists.  The dull knife did not accomplish the purpose, so Bessett drew a serrated bread knife from the kitchen.  He walked to McClure's master bathroom, filled the tub partially with water, and cut both wrists, the left side of his neck, and his left elbow.

PROCEDURE

The State of Washington charged Norman Bessett with burglary in the first degree, unlawful imprisonment, and assault in the fourth degree.  Each charge included a

6

domestic violence allegation. Following a bench trial, the trial court convicted Bessett of all three crimes and the domestic violence additions.

During an oral ruling, the trial court remarked that Norman Bessett's attempted suicide immediately after the incident belied his testimony characterizing his behavior as appropriate and his demeanor as calm. The court questioned the accuracy of Bessett's memory, considering his heightened emotional state of mind and loss of consciousness following the suicide attempt. The court acknowledged that the facts differed substantially between the parties, but found Cindy McClure more credible than Bessett.

The trial court entered written findings of fact and conclusions of law. Finding of fact number eight declared:

> Thus the remaining in the house was done with the intent to commit an offense, which was the restraining of Ms. McClure by force.

Clerk's Papers (CP) at 42.

## LAW AND ANALYSIS

### Sufficiency of Evidence

Norman Bessett contends that insufficient evidence supports his conviction of first degree burglary. In this regard, he contends that the evidence failed to support finding of fact 8, that he remained inside Cindy McClure's home with the intent to unlawfully restrain McClure. Bessett does not challenge his other two convictions.

Whether sufficient evidence supports a conviction depends on whether, when viewed in the light most favorable to the prosecution, any rational finder of fact could have found the elements of the crime beyond a reasonable doubt. *State v. Homan*, 181 Wn.2d 102, 105, 330 P.3d 182 (2014). Following a bench trial, the reviewing court evaluates whether substantial evidence supports the trial court's findings of fact, and if so, whether the findings support the conclusions of law. *State v. Stevenson*, 128 Wn. App. 179, 193, 114 P.3d 699 (2005). Courts define substantial evidence as "evidence sufficient to persuade a fair-minded, rational person of the finding's truth." *State v. Stevenson*, 128 Wn. App. at 193. Reviewing courts consider unchallenged findings of fact verities on appeal, and review conclusions of law de novo. *State v. Homan*, 181 Wn.2d at 106.

A defendant claiming insufficient evidence necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from it. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Such inferences are "drawn in favor of the State and interpreted most strongly against the defendant." *State v. Salinas*, 119 Wn.2d at 201. Courts defer to the trial court's resolution of credibility issues, conflicting versions of the facts, and the persuasiveness of the evidence. *State v. Homan*, 181 Wn.2d at 106.

RCW 9A.52.020 defines the crime of first degree burglary. The statute declares:

> A person is guilty of burglary in the first degree if, with intent to commit a crime against a person or property therein, he or she enters or

8

> remains unlawfully in a building and if, in entering or while in the building
> . . . the actor . . . assaults any person.

A person acts with intent when he or she acts with the objective or purpose to accomplish a result constituting a crime. RCW 9A.08.010(1)(a). The trier of fact gathers evidence of intent from all the circumstances surrounding the accused's action. *State v. Ferreira*, 69 Wn. App. 465, 468-69, 850 P.2d 541 (1993). To prove the crime of burglary, the State need not show that the accused intended to commit a specific crime, but only an intent to commit any crime against a person or property inside the premises. *State v. Bergeron*, 105 Wn.2d 1, 4, 711 P.2d 1000 (1985).

In challenging finding of fact 8, Norman Bessett contends that insufficient evidence shows he intended to restrain Cindy McClure against her consent. He argues that the total circumstances of the incident establish that he merely intended to remain in the home in order to reconcile the relationship, not to commit a crime against McClure. We disagree.

Norman Bessett's behavior during the entire day of February 8 and particular his actions while restraining Cindy McClure show an intent to either enter the house for the purpose of confining McClure's movement or an intent to stay within the home for the purpose of imprisoning McClure. Stated differently and as highlighted by the State, even if Bessett did not decide to restrain McClure until late afternoon, he unlawfully remained inside the residence after forming the intent.

9

The evidence, in the glow favorable to the State, shows that Cindy McClure told Norman Bessett he was unwelcome inside the residence. Bessett chose February 8 to, without permission, unlawfully enter McClure's residence because he knew McClure would leave the front door unlocked for the housekeeper. Bessett parked his truck far from McClure's residence in order to prevent detection from the housekeeper or to avoid giving McClure advance notice of his presence. When McClure appeared in the bedroom, Bessett formed an intent to restrain McClure. When tightening his grasp, Bessett told McClure she could not leave. McClure sought release by her comments and her behavior. She asked, "'why won't you let me go'" and attempted to maneuver free many times. RP at 129. Bessett forcefully threw McClure to the bed. He imprisoned her for two hours. The circumstances show an intent to remain unlawfully in the home in order to assault McClure. Sufficient evidence supports the trial court's finding that "the remaining in the house was done with the intent to commit an offense, which was the restraining of Ms. McClure by force." CP at 42.

## Statement of Additional Grounds

Norman Bessett filed a pro se statement of additional grounds for review consisting mostly of direct citations to the report of proceedings whereat Bessett asserts Cindy McClure lied to the court during trial testimony. Bessett repeats a common theme of McClure being manipulative, deceitful, vindictive, and abusive. This court defers to

10

the trier of fact on the questions of credibility of witnesses and the persuasiveness of the evidence. *State v. Bencivenga*, 137 Wn.2d 703, 708-09, 974 P.2d 832 (1999).

Norman Bessett divulges anecdotes regarding facts not found in the trial record. We do not consider contentions outside the record. RAP 10.10(c).

To the extent that Norman Bessett's statement implies other errors, the contentions lack sufficient articulation for appellate review. This court will not consider a defendant's statement of additional grounds for review, if the statement does not inform the court of the nature and occurrence of alleged errors. RAP 10.10(c).

Trial Court Costs

By motion filed on October 22, 2018, Norman Bessettt asks this court to reverse the trial court's imposing of a $200 criminal filing fee and a $100 DNA collection fee. Bessett's argument relates to the amendments to many of the legal financial obligation statutes by House Bill 1793 and our Supreme Court's recent decision, *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018). Bessett filed his opening brief on June 19, 2018. House Bill 1783 became effective June 7, 2018 and *Ramirez* was issued on September 20, 2018. Accordingly, due to the timing of *Ramirez*, Bessett was not able to raise this issue in his opening brief and asks that this court treat his motion as a supplemental brief.

Our Supreme Court in Ramirez held the statutory requirements set forth in House Bill 1783 apply prospectively to cases on direct appeal at the time the amendment was enacted. *State v. Ramirez*, 191 Wn.2d 732, 747, 426 P.3d 714 (2018). The court stated

that "Ramirez's case was on appeal as a matter of right and thus was not yet final under RAP 12.7 when House Bill 1783 became effective. Because House Bill 1783's amendments pertain to costs imposed upon conviction and Ramirez's case was not yet final when the amendments were enacted, Ramirez is entitled to benefit from this statutory change." *State v. Ramirez*, 191 Wn.2d at 749. We follow the Supreme Court's predicate and accept Bessett's motion as a supplemental brief.

While the DNA collection fee of $100 was previously a mandatory legal financial obligation, under the new amendments of House Bill 1783, the fee is no longer mandatory if a person's DNA has already been collected because of a prior conviction. *State v. Ramirez*, 191 Wn.2d at 747. The $200 criminal filing fee may also not be imposed on indigent defendants. *State v. Ramirez*, 191 Wn.2d at 747. Because Bessett's case was not yet final when House Bill 1783 was enacted, Bessett may benefit from the statutory changes.

A review of the judgment and sentence reveals that Norman Bessett has no criminal history. Thus, the DNA fee will remain. Regarding the criminal filing fee, however, Bessett was found indigent for purposes of appeal, and he filed a report as to his continued indigency. Therefore, we remand to the trial court to strike the imposition of the $200 criminal filing fee.

## CONCLUSION

We affirm Norman Bessett's conviction for first degree burglary. We remand to the trial court to strike the imposition of the $ 200 criminal filing fee.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Korsmo, J.

_____
Siddoway, J.

13